NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0392n.06

Case No. 18-3507

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| | | **FILED** |
| | | Jul 31, 2019 |
| | | DEBORAH S. HUNT, Clerk |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| DAMAR D. RUFFIN, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GILMAN, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge.  A jury convicted Damar Ruffin of conspiring to possess with intent to distribute over two kilograms of methamphetamine.  This marked his fifth felony drug conviction.  It could mark his last, as the offense came with a life sentence.  Ruffin objects to his conviction and sentence.  Because none of his arguments carries the day, we affirm.

I.

In October 2015, a Postal Inspection Service drug dog alerted on a suspicious package. Warrant in hand, investigators cracked it open and discovered four pounds of methamphetamine. The officers weren't the only ones interested in the package.  Someone had tracked its shipping status three times on the day of its expected delivery, each time with the same phone number.  And someone, perhaps the same someone, used that phone number to call the destination residence of the package just minutes after running a status check.  Investigators learned that the phone number

belonged to Damar Ruffin, a four-time convicted drug felon. The officers seized the package but did not arrest anyone then.

In November 2015, authorities intercepted two more packages on their way to two different addresses in the same area, collectively containing eight more pounds of methamphetamine. Investigators noticed that both packages were assigned to the same mail carrier. Suspicious, they set a trap. They replaced the drugs in one package with a placebo. They replaced the drugs in the other package with a representative sample and a GPS tracking device. And they released both packages for drop-off. Then the undercover officers followed the mail carrier.

The mail carrier received the packages but never delivered them. She instead scanned them as delivered, confiscated them, and completed her route. When her shift ended, she transferred the packages' contents to her personal car and, after a short detour, drove them to a known drug house nicknamed "the Mansion." Fearing the packages' contents might disappear if taken inside, the officers arrested the mail carrier as soon as she pulled into the driveway.

From inside the Mansion, Ruffin and others saw the arrest. The occupants scattered. Ruffin made a hasty escape out the backdoor and down a side street. He didn't get far. Police spotted him—he is 6'8" and 350 pounds—and stopped him within a block of the residence. An officer familiar with the October 2015 methamphetamine investigation recognized Ruffin and arrested him. Investigators searched him. They found $1,400 in cash, a bag of marijuana, and two cellphones.

When the police searched the two cellphones, Ruffin's prospects went from bad to worse. Police found a photo—taken the morning the November packages were shipped—that displayed a piece of mail postmarked to the destination address of the package. They learned that Ruffin had extensive communication with Randolph Harris (who later admitted to helping Ruffin pack

and ship the methamphetamine) and Wesley Tucker (who provided the mail carrier with delivery instructions for the packages). And they found that Ruffin participated in a Facebook group message on the packages' expected delivery date featuring messages such as "Touchdown, answer phone." R. 99 at 120. Authorities also used location data from the cellphones—in conjunction with other evidence—to create a map of Ruffin's movements before the November methamphetamine deliveries. The map corroborated the account that Harris provided to authorities.

A grand jury charged Ruffin with conspiracy to possess with intent to distribute over two kilograms of methamphetamine. He moved to suppress the evidence collected from his cellphones. The court rejected his motion. Ruffin proceeded to trial, and a jury convicted him. The court imposed a mandatory life sentence due to his extensive criminal history.

II.

*Conviction*. Ruffin offers a range of arguments about why his conviction should be set aside. None of them moves the ball down the field.

1. Ruffin argues that the court erred in admitting evidence from his cellphones because the officers lacked probable cause to arrest him in the first place. In gauging this claim, we consider all of the circumstances that led to his arrest, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003), and ask whether they establish a fair probability that the suspect violated the law, *see Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001). "[H]eadlong flight" from police is the "consummate act of evasion," especially when it occurs in a "high crime area." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Coupled with preexisting suspicion, that fact alone can amount to probable cause. *See Sibron v. New York*, 392 U.S. 40, 66 (1968).

3

Today's evidence easily adds up to probable cause. Ruffin took off running when he saw the police; there's your headlong flight. He ran out of a known drug house; there's your high-crime area. On top of that, Ruffin's flight was a direct response to a live drug bust. And the officers who arrested him knew that he tracked the October methamphetamine delivery and had good reason to connect that shipment with the November shipments.

Ruffin offers a parade of what-ifs in response: What if the mail carrier was delivering the packages to someone else in the house? What if she was paying a social visit and planned to take them elsewhere? What if she was idling in the driveway and never intended to get out of her car? Fair questions all. But regrettably for Ruffin, they are questions that would a make difference only in a guilt-beyond-a-reasonable-doubt inquiry, not a probable-cause inquiry. Probable cause just requires circumstances that create a fair probability of criminality. The officers had plenty of that.

2. Ruffin claims that the government violated his rights by accessing his cellphones' location information without a warrant. No violation occurred, because the exclusionary rule does not apply. Courts, it's true, often suppress evidence obtained in violation of the Fourth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). But an exception exists for evidence gathered by officers acting under a reasonable "good-faith belief" that they did all the law required. *United States v. Leon*, 468 U.S. 897, 909 (1984). The exception covers good-faith reliance on Congressional statutes, so long as they aren't "clearly unconstitutional." *Illinois v. Krull*, 480 U.S. 340, 349 (1987).

By all accounts, the officers' subpoenas for location information, initiated before the *Carpenter* decision, comported with the requirements of the Stored Communications Act, 18 U.S.C. § 2703(d). That statute is far from "clearly unconstitutional." At the time, it contained ample procedural safeguards to assuage the Fourth Amendment concerns of reasonable line-level

officers. *United States v. Carpenter*, 926 F.3d 313, 318 (6th Cir. 2019). These same safeguards had already assuaged the Fourth Amendment concerns of two circuits by the time the authorities filed subpoenas in this case. *See In re Application for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013); *United States v. Davis*, 785 F.3d 498, 518 (11th Cir. 2015).

That explains why we've held that evidence collected pre-*Carpenter* in reasonable reliance on the Act's prescribed procedure need not be excluded. *See Carpenter*, 926 F.3d at 318. Every other circuit to address the issue agrees. *See United States v. Chambers*, 751 F. App'x 44, 46 (2d Cir. 2018); *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Curtis*, 901 F.3d 846, 848 (7th Cir. 2018); *United States v. Korte*, 918 F.3d 750, 759 (9th Cir. 2019); *United States v. Joyner*, 899 F.3d 1199, 1204 (11th Cir. 2018) (per curiam).

3. Ruffin also challenges the sufficiency of the evidence to support his conviction. That is not an easy claim in general, as we will grant relief only if no "rational trier of fact" could find the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And that is not an easy claim here in view of the evidence arrayed against him.

The government had to prove three things: there was an agreement to violate the drug laws, Ruffin intended to join the agreement, and he participated in the agreement. *See United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996). Ample evidence showed all of that. Ruffin repeatedly tracked the October methamphetamine shipment, and he contacted the destination residence minutes later. Ruffin had a photo taken the morning the November packages were shipped displaying the destination address. He had a pattern of suspicious communications with Harris and Tucker—both confessed members of the drug-distribution conspiracy. He was at the Mansion at the time the delivery occurred. And he took off running when the police arrived.

Harris's testimony makes things easier. He explained under oath, and in detail, how Ruffin helped to package the methamphetamine and to coordinate its shipment. If the *uncorroborated* testimony of a single co-conspirator can sustain a conviction if it establishes all the necessary inferences, *see United States v. Graham*, 622 F.3d 445, 450 (6th Cir. 2010), surely this evidence can do the same. Harris's testimony goes to all three elements of conspiracy. And location data from Ruffin's own cellphones corroborated the story.

But, Ruffin counters, Harris admitted on the stand that he was willing to lie if it meant protecting his own skin. And in exchange for his testimony, he stood to receive a substantially reduced sentence. How do we know, he asks, that the jury believed him? Truth be told, we don't. But for purposes of sufficiency review, we don't need to know for sure. All that matters is that a reasonable jury *could* have believed Harris's testimony. *See United States v. Marshall*, 248 F.3d 525, 536 (6th Cir. 2001). This jury could have done just that.

*Sentence*. Ruffin also challenges his mandatory life sentence.

1. Ruffin begins by arguing that 21 U.S.C. § 841(b), which imposes a mandatory life sentence on third-time (and beyond) drug felons, unconstitutionally precludes judges from considering factors unique to each individual's case. *See* 18 U.S.C. § 3553. On his view, this violates (in combination) the Fifth, Eighth, and Fourteenth Amendments. Not so. The range of criminal penalties at the judiciary's disposal is "subject to congressional control." *Mistretta v. United States*, 488 U.S. 361, 364 (1989). Congress may "eliminate all discretion" from federal courts by fixing mandatory sentences if it wishes to do so. *United States v. Dumas*, 934 F.2d 1387, 1389 (6th Cir. 1990). Case after case says just that. *See Miller v. Alabama*, 567 U.S. 460, 481 (2012); *United States v. Richardson*, 793 F.3d 612, 632 (6th Cir. 2015), *judgment vacated on other*

*grounds*, 136 S. Ct. 1157 (2016); *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008). In § 841(b), Congress made that choice. We have no warrant to second-guess that judgment.

Nor does it make a difference that capital defendants by contrast have a constitutional right to individualized sentencing. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 248 (2007). Individualized sentencing is one of many ways that "death is different" in the Court's estimation. *Miller*, 567 U.S. at 481. That difference has left the Court disinclined to extend a similar entitlement to non-capital defendants. *See Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (plurality opinion). It has left us similarly disinclined. *See, e.g.*, *Graham*, 622 F.3d at 453; *Odeneal*, 517 F.3d at 415; *United States v. Dumas*, 934 F.2d 1387, 1389 (6th Cir. 1990). We have no authority to change course now and here.

2. Ruffin adds in the alternative that a life sentence is too harsh for a crime of this severity and runs afoul of the Eighth Amendment on that basis alone. When it comes to challenges of this sort, we follow a "narrow proportionality principle," which strikes down only those sentences "grossly disproportionate" to the crime. *United States v. Hill*, 30 F.3d 48, 50 (6th Cir. 1994). As a benchmark, we look to the Supreme Court's plurality opinion in *Harmelin*, which upheld the life sentence of a first-time felon convicted of cocaine possession. 501 U.S. at 994–95. Since then, this court has repeatedly affirmed life sentences for conspiracy to commit drug-related offenses. *See, e.g.*, *Graham*, 622 F.3d at 452; *Odeneal*, 517 F.3d at 413–15; *Hill*, 30 F.3d at 48.

Acknowledging the precedent arrayed against him, Ruffin tries to distinguish those cases on the ground that he, unlike the defendants in those cases, did not "actively attempt[] to possess or distribute methamphetamine." Appellant's Br. 11. But if Ruffin means to say that his conduct was less culpable than theirs, we can't agree. The government's case-in-chief establishes that Ruffin traveled out of Ohio to assist Harris in packaging methamphetamine. And it shows that he

quarterbacked that methamphetamine's delivery into Ohio. There was nothing "inactive" about this conduct. Notably, the support for Ruffin's sentence is stronger than in other life-sentence cases, because Ruffin moved over two kilograms of narcotics, *cf. Harmelin*, 501 U.S. at 961 (672 grams); *Hill*, 30 F.3d at 50 (177.8 grams), and this is his fifth felony drug conviction, *cf. Harmelin*, 501 U.S. at 994 (no prior felony convictions); *Hill*, 30 F.3d at 50 (two prior felony convictions).

3. Last of all, Ruffin requests resentencing under the First Step Act, Pub. L. No. 115-391, § 401(a)(2), 132 Stat. 5194, 5220 (2018) (amending 21 U.S.C. § 841(b)(1)(A)(viii)). The first problem with this argument is that Ruffin waited until his reply brief here to raise it. That is too late. *See United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002). The second problem is that this portion of the Act doesn't apply retroactively. *See United States v. Potter*, 927 F.3d 446, 455 (6th Cir. 2019).

We affirm.