NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

AUG 16 2021

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff-Appellee,<br><br>  v.<br><br>KEITH MARVEL WALTON, AKA Kameron Montoya Aiken, AKA Kevin Cook, AKA Green, AKA Green Eyes, AKA Marvell Smith Hariston, AKA Marvell Harriston, AKA Keith Parker, AKA Keith Marvell Wahon, AKA Keith M. Walton, AKA Keith Marvell Walton, AKA Marvell Walton,<br><br>            Defendant-Appellant. | No.   18-50262<br>        19-50283<br><br>D.C. No.<br>8:16-cr-00029-CJC-4<br><br>MEMORANDUM* |
| UNITED STATES OF AMERICA,<br><br>            Plaintiff-Appellee,<br><br>  v.<br><br>JAMESON LAFOREST, AKA J-Bone, AKA Jamerson, AKA Janky Bone, AKA Jamerson LaForest,<br><br>            Defendant-Appellant. | No.   18-50316<br>        19-50281<br><br>D.C. No.<br>8:16-cr-00029-CJC-10 |

        *      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

  v.

ROBERT WESLEY JOHNSON, AKA
Black Rob, AKA Bogart, AKA T Bone,
AKA Tiny Bogart, AKA Tiny Bogie,

      Defendant-Appellant.

No.   18-50323
      19-50280

D.C. No.
8:16-cr-00029-CJC-5

Appeals from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted July 9, 2021
Pasadena, California

Before: WATFORD and BUMATAY, Circuit Judges, and FREUDENTHAL,[**] District Judge.
Concurrence by Judge WATFORD

Keith Walton, Jameson LaForest, and Robert Johnson appeal from the district court's judgment following their convictions and sentences for their involvement in a series of jewelry store robberies across Southern California from 2014 to 2016. A jury convicted them of conspiracy to commit Hobbs Act robbery, substantive Hobbs Act robbery, and use of a firearm during and in relation to a crime of violence. We affirm.

---

[**] The Honorable Nancy D. Freudenthal, United States District Judge for the District of Wyoming, sitting by designation.

**1.** The district court properly denied the motion to suppress cell-site location information. After the trial in this case, the Supreme Court decided *Carpenter v. United States*, 138 S. Ct. 2206 (2018), which held that in order to access an individual's cell-site location information, the government must obtain a search warrant and may no longer rely on an order obtained under the Stored Communications Act (SCA), 18 U.S.C. § 2703(d). 138 S. Ct. at 2221–23. Our court then held that, under the good-faith exception established in *Illinois v. Krull*, 480 U.S. 340 (1987), cell-site location information obtained pre-*Carpenter* is admissible so long as the government satisfied the SCA's then-lawful requirements. *United States v. Korte*, 918 F.3d 750, 759 (9th Cir. 2019). *Korte* is directly on point here. The relevant SCA order in this case was also obtained pre-*Carpenter*, and it was objectively reasonable at the time for the prosecutor to rely on the SCA's requirements to obtain cell-site location information. Contrary to defendants' assertions, when the government acts in objectively reasonable reliance on a facially valid statute, there is no additional requirement that binding appellate precedent exist authorizing the search. *See id.* at 758–59.

**2.** The district court properly declined to take further investigative action after receiving the government's *in camera* disclosure about potential juror bias. The court need investigate only when confronted with "a colorable claim of juror bias," *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) (en banc), and here no

such claim was presented. The information the court received from the government did not provide any basis for concluding that the juror might be biased and, according to the informant, the defendants themselves were the source of the underlying information in any event. The court properly considered "the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" to conclude that no further action was necessary unless the government intended to pursue the matter further. *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003). The court thus appropriately resolved a question about potential juror bias *ex parte* and *in camera*, and it also appropriately declined to provide defendants with the unredacted version of the government's *in camera* disclosure in order to protect the identity of the informant.

**3.** The district court did not plainly err in instructing the jury that *Pinkerton* liability applied to the 18 U.S.C. § 924(c) counts. Defendants contend that *United States v. Davis*, 139 S. Ct. 2319 (2019), *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), and *Rosemond v. United States*, 572 U.S. 65 (2014), dictate a contrary result, but we recently rejected those same arguments in *United States v. Henry*, 984 F.3d 1343, 1354–56 (9th Cir. 2021).

Defendants also argue that the *Pinkerton* instruction constructively amended the indictment, but our decision in *United States v. Roselli*, 432 F.2d 879 (9th Cir. 1970), squarely forecloses that contention. In *Roselli*, we rejected the argument

that a *Pinkerton* instruction broadened the indictment in violation of the Fifth Amendment right to be held to answer only "on a presentment or indictment of a Grand Jury." *Id.* at 895. Here, defendants were charged with conspiracy to commit Hobbs Act robbery and were on notice that a *Pinkerton* theory of liability could be used for substantive offenses, including the § 924(c) offenses. The indictment did not need to include a specific *Pinkerton* allegation to provide adequate notice. *See id.*

**4.** The district court properly instructed the jury that Hobbs Act robbery constitutes a crime of violence under § 924(c). In *United States v. Dominguez*, 954 F.3d 1251 (9th Cir. 2020), we held that Hobbs Act robbery committed by "placing a victim in fear of bodily injury is categorically a crime of violence," and rejected a claim that Hobbs Act robbery can be committed by placing a victim in "fear of injury to some intangible economic interest." *Id.* at 1260.

Although defendants contend that Hobbs Act robbery can be committed with *de minimis* force, they have failed to identify any realistic scenarios to support their contention. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). In particular, defendants have not pointed to a case in which a "court[] in fact did apply the statute" in the manner they describe. *Id.* They hypothesize that a purse snatching could be accomplished with *de minimis* force, but they have not identified a single example of such a prosecution under the Hobbs Act. Nor do

their hypothetical prosecutions predicated on scratching a fancy car or tearing a valuable stamp evince a "realistic possibility" that such conduct could result in a conviction for Hobbs Act robbery. *See Dominguez*, 954 F.3d at 1260. We therefore leave undisturbed our holding that Hobbs Act robbery is categorically a crime of violence under § 924(c). *Id.* at 1260–61.

**5.** The district court properly denied defendants' motion for a new trial based on the jury's exposure to three sets of unadmitted exhibits. We consider the nine *Dickson/Jeffries* factors to evaluate whether the government has met its burden of showing that the unadmitted exhibits did not contribute to the verdict. *United States v. Prime*, 431 F.3d 1147, 1157 (9th Cir. 2005). After conducting an independent review of the record, we agree with the district court that there is no reasonable possibility that the jury's exposure to these unadmitted exhibits affected the verdict. *See id*.

The first set of unadmitted exhibits were demonstrative and summary charts used during the government's closing argument. The jury's self-policing—alerting the court to its inadvertent receipt of these exhibits—demonstrates that the jury adhered to the court's consistent instructions throughout trial that these charts were not evidence. *See United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1581 (9th Cir. 1989). In addition, the charts were cumulative of evidence already introduced at trial, the jury's exposure to them was limited, and the court gave a

curative instruction afterwards. *See Prime*, 431 F.3d at 1157. Indeed, when the court polled the jurors after they issued their verdict, only three jurors were exposed to any of the summary charts, and eight jurors were certain they had not heard any discussion about the charts during deliberations. As a result, there is no reasonable possibility that these charts affected the jury's verdict.

The second set of unadmitted exhibits are criminal court documents showing Walton's and another codefendant's prior convictions. Although the inadvertent submission of these documents to the jury is concerning, there is similarly no reasonable possibility that they affected the jury's verdict because no juror saw them. *See United States v. Lopez-Martinez*, 543 F.3d 509, 517 (9th Cir. 2008). When the court polled the jurors, all twelve affirmed that "they neither saw nor heard any discussion regarding criminal court documents." Defendants have thus failed to meet their burden of making the threshold factual showing that the jury "obtained or used evidence that was not introduced at the trial." *Id.*

The third set of unadmitted exhibits (Exhibit 157) consists of photographs taken during a search of Johnson's home. The district court was unable to poll the jurors about Exhibit 157 because, despite being made aware of the inadvertent inclusion of this exhibit during the re-review process, Johnson's counsel did not identify Exhibit 157 as problematic until after the jury had been discharged. Even assuming that the jury was exposed to the photographs, however, there is no

reasonable possibility that Exhibit 157 affected the verdict. No person was depicted in the photographs, and they contained no obvious reference to Johnson. As the district court found, the firearms depicted in Exhibit 157 did not match the testimonial description of the firearm used during the Del Amo robbery. Furthermore, ample evidence admitted at trial established Johnson's guilt on the substantive Hobbs Act robbery in Count Eleven and the derivative § 924(c) offense in Count Twelve. That evidence included testimony from multiple cooperating witnesses as well as civilian witnesses, physical evidence, text messages, and cell-site location information. Thus, there is no reasonable possibility that Exhibit 157 affected the jury's verdict.

Finally, the district court also properly refused to grant a new trial based on the government's role in organizing the exhibits. As confirmed by the courtroom surveillance videos, the inadvertent inclusion of unadmitted exhibits was attributable to both parties' negligence and not prosecutorial misconduct. Although the government should not have made unilateral changes to the exhibits, the court found that the government made those changes either to provide the jury with admitted exhibits or to prevent the jury from receiving prejudicial material. There was no evidence of bad faith on the part of the government. Accordingly, defendants have not established that they are entitled to a new trial.

**6.** The district court properly calculated defendants' sentences. First, the court correctly used the retail value of the stolen watches to calculate loss under U.S.S.G. § 2B3.1. Although defendants argue that the court should have used the wholesale or replacement cost of the watches instead of the higher retail value, it was reasonable for the court to calculate loss based on retail value. *See United States v. Hardy*, 289 F.3d 608, 613 (9th Cir. 2002). Unlike in *Hardy*, the victims here were retailers and not wholesalers, so the court reasonably found that "retail value is a more accurate and fair indicator of loss," as opposed to the wholesale value or the amount reimbursed by insurance. The loss calculation thus accounted for the "actual situation presented" and reflected the market in which the victims would have sold the stolen watches. *Id.* at 614; *accord United States v. Natour*, 700 F.3d 962, 978 (7th Cir. 2012); *United States v. Lige*, 635 F.3d 668, 671–72 (5th Cir. 2011).

Second, as defendants concede in reply, *United States v. Lavender*, 224 F.3d 939 (9th Cir. 2000), supports the district court's conclusion that a sledgehammer is a "dangerous weapon" justifying the enhancement under U.S.S.G. § 2B3.1(b)(2)(E). Just like the screwdriver at issue in *Lavender*, a sledgehammer is capable of inflicting death or serious bodily injury. *See* 224 F.3d at 941. It is irrelevant whether LaForest intended to use the sledgehammer with the purpose of

causing bodily injury, as the mere fact that he used it during a robbery was sufficient to justify application of the enhancement. *See id.*

**7.** Defendants raise two final issues for us to resolve. First, they object to the sealing of the government's answering brief. Given the limited redactions and the government's compelling interest in protecting the cooperating witnesses and their families, the answering brief shall remain sealed, and both the sealed and redacted versions shall remain on the docket. Second, LaForest objects to the caption listing "Hitman" as an alias for him. Because this alias does not appear in the indictment or anywhere else in the underlying record, the Clerk of Court is directed to strike the alias "Hitman" from the caption in all subsequent court filings.

**AFFIRMED.**

FILED

AUG 16 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. Walton*, No. 18-50262+

WATFORD, Circuit Judge, concurring:

This is one of countless cases in which federal courts have upheld convictions under 18 U.S.C. § 924(c) based on so-called "*Pinkerton* liability," a doctrine that takes its name from *Pinkerton v. United States*, 328 U.S. 640 (1946). The rule spawned by that case—which holds members of a conspiracy vicariously liable for all reasonably foreseeable crimes committed by their co-conspirators in furtherance of the conspiracy—has long been the subject of criticism. The rule is unsound for many reasons, among them that no statute enacted by Congress authorizes this form of vicarious liability, *see Developments in the Law—Criminal Conspiracy*, 72 Harv. L. Rev. 920, 994–95 (1959), and that the rule permits conviction based on a *mens rea* of negligence when the substantive offense frequently requires a more culpable mental state, *see* American Law Institute, Model Penal Code and Commentaries § 2.06, Comment, p. 312 & n.42 (1985). The drafters of the Model Penal Code were right in concluding that liability for substantive offenses committed by co-conspirators "should be controlled by the same limits that are otherwise the measure of liability for complicity." *Id.* at 310. As they observed, and contrary to *Pinkerton*'s fundamental premise, "conspiracy does not present a special case for broadened liability." *Id.* at 310 n.35.

The flawed nature of *Pinkerton*'s rule as applied to § 924(c) offenses has been cast into stark relief following the Supreme Court's decision in *Rosemond v. United States*, 572 U.S. 65 (2014). There, the Court held that, to be convicted under § 924(c) as an aider or abettor, a defendant must have participated in the predicate offense with "advance knowledge that a confederate would use or carry a gun during the crime's commission." *Id.* at 67. That use of a gun during the crime was reasonably foreseeable is not enough to sustain a conviction. No principled basis exists for permitting vicarious liability for § 924(c) offenses under a less rigorous rule merely because a conspiracy is involved. Perhaps *Rosemond*'s analysis of the *mens rea* required for vicarious liability in the aiding-and-abetting context will lead the Supreme Court to reassess application of the *Pinkerton* rule to § 924(c) offenses in the conspiracy context—and eventually to reconsider *Pinkerton* itself.